IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DONALD BIRCH JR.,[1] | § | |
| | § | No. 538, 2019 |
| Respondent Below, | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below–Family Court |
| | § | of the State of Delaware |
| DEPARTMENT OF SERVICES FOR | § | |
| CHILDREN, YOUTH AND THEIR | § | File Nos. CN18-06676 |
| FAMILIES/DIVISION OF FAMILY | § | 19-09-03TN |
| SERVICES (DSCYF/DFS), | § | Petition Nos. 18-36853 |
| | § | 19-26316 |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: May 1, 2020
Decided: July 9, 2020

Before **SEITZ**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

## ORDER

Upon consideration of the appellant's brief filed under Supreme Court Rule 26.1(c), his attorney's motion to withdraw, the appellee's response and motion to affirm, and the Child Attorney's response, it appears to the Court that:

(1) The appellant, Donald Birch Jr. ("the Father"), appeals the Family Court's order dated November 25, 2019, terminating his parental rights in his minor

---

[1] The Court previously assigned pseudonyms to the parties pursuant to Supreme Court Rule 7(d).

son ("the Child"). The parental rights of the Child's mother ("the Mother") were terminated in the same order but are not at issue in this appeal.

(2) The Department of Services for Children, Youth and Their Families/Division of Family Services ("DFS") filed an emergency petition for custody of the Child in December 2018 after DFS received a hotline report from the neonatal intensive care unit ("NICU") at St. Francis Hospital. The hotline report alleged that the Mother had tested positive for marijuana at the hospital and had admitted to using crack cocaine three days before the Child's premature birth. At the time, the Father's paternity had not been established. With the filing of DFS's dependency and neglect petition, the mandated hearings ensued.[2]

(3) At the December 19, 2018 preliminary protective hearing, the Family Court appointed counsel to represent the Father, who did not dispute being the Child's father, and ordered genetic testing to confirm his paternity.[3] DFS proffered that the Child had tested positive for illicit substances at birth. The Father and the Mother were residing at the Child's maternal grandfather's home and neither was employed. DFS was exploring relatives, including the maternal grandfather, as possible placement resources. At the conclusion of the hearing, the Family Court

---

[2] When a child is removed from home by DFS and placed in foster care, the Family Court is required to hold hearings at regular intervals under procedures and criteria detailed by statute and the court's rules. 13 *Del. C.* § 2514; Del. Fam. Ct. R. 212-219.

[3] The genetic testing verified the Father's paternity.

found that the Child was dependent in the Father's care because he lacked financial and housing stability. The court also noted that it was concerned about the Father's ability to protect the Child from the Mother—who was not compliant with a separate DFS case plan concerning another one of her children—because the parents were living together. The court found that DFS had made reasonable efforts to prevent the unnecessary removal of the Child from the home and to reunify the family.

(4) On January 19, 2019, the Family Court held an adjudicatory hearing. The Father and the Mother continued to live with the Child's maternal grandfather, whom DFS was researching as a possible placement option. Although the Father had obtained employment, he had not yet received a paycheck. The Child appeared to be experiencing substance withdrawal but was otherwise doing well in the foster home. At the conclusion of the hearing, the Family Court found that the Child continued to be dependent in the Father's care in large part because the parents continued to live together and the Mother was not in compliance with her active DFS case plan involving the Child's half-sibling.

(5) DFS developed a case plan for the Father's reunification with the Child. The Father's case plan required that he: (i) undergo a mental health evaluation and follow through with any recommendations made; (ii) undergo a substance abuse evaluation and follow through with any recommendations made; (iii) successfully

complete parenting classes; and (iv) work with a family interventionist to secure stable housing and establish a budget.

(6) The Family Court held a review hearing on May 7, 2019. The Father had moved out of the Child's maternal grandfather's home and was living with a co-worker while he searched for housing. The Father was making great strides toward satisfying the conditions of his case plan: he had been proactive in seeking appropriate and stable housing; he was still gainfully employed; he had completed his parenting classes; he was engaged with his family interventionist; and he was scheduled to complete his substance abuse evaluation that week. The Father had undergone a mental health evaluation and it was recommended that he attend weekly outpatient therapy, undergo a psychiatric evaluation, attend Alcoholics Anonymous meetings, and consult with a physician about his epilepsy diagnosis. The Father had attended four visits with the Child since the last hearing; however, three other visits were cancelled when the Father failed to confirm them as required by DFS policy.

(7) At the Father's request, DFS had contacted the Child's paternal grandmother, a Virginia resident, about being a possible placement resource. Although the paternal grandmother expressed an interest in caring for the Child, she told DFS that she was not currently able to provide him with adequate care. The Child suffered from significant health problems and was several months behind developmentally, but was receiving appropriate services and otherwise doing well

4

in the foster home. At the conclusion of the hearing, the Family Court found that the Father was making satisfactory progress on his case plan but that the Child continued to remain dependent in his care because the Father continued to rely on others to meet his needs.

(8) On August 12, 2019, the Family Court held another review hearing. The Father did not appear for the hearing. DFS proffered that the Father (i) had moved to Virginia in July to reside with his mother, (ii) had been homeless prior to the move, and (iii) had not been gainfully employed since May. Although DFS informed the Father that he must complete his case plan before the Child could be placed in the paternal grandmother's home, the Father had not (i) completed the recommended follow-up mental health evaluation, (ii) completed his substance abuse evaluation, or (iii) visited with the Child since July 9, 2019. Nevertheless, DFS had initiated the process for approval for the Child's placement with the paternal grandmother under the Interstate Compact of the Placement of Children ("ICPC"). The Family Court found that the Child continued to be dependent in the Father's care, the Father had not been satisfactorily compliant with his case plan, and DFS had made reasonable efforts to reunify the family.

(9) On August 27, 2019, the Family Court granted DFS's motion to change the permanency goal from reunification to termination of parental rights ("TPR") for purposes of adoption. In its order granting the motion to change the goal, the Family

Court noted that neither the Father nor the Mother had responded to the motion. On September 13, 2019, DFS filed a petition to terminate the Father's parental rights in the Child on the basis of his failure to plan adequately for the Child's physical needs or mental and emotional health and development.

(10) At the November 4, 2019 TPR hearing, the Family Court heard testimony from the DFS treatment worker, the DFS permanency worker, and the Father. The testimony reflected that the Father had returned to Delaware approximately ten days before the hearing and was homeless.[4] Although the Father had been able to transfer his employment with Dollar General in Virginia to Delaware, he had just started at its Delaware location the previous day and had not yet received a paycheck. He anticipated working seven days a week. Due to his epilepsy diagnosis, the Father was not able to drive and relied on others for transportation. The Father had completed parenting classes, but he had not completed his substance abuse evaluation or followed through with the recommendations made after his initial mental health evaluation. Significantly, the Father had not seen his infant son since July 9, 2019, and he had not inquired about the Child's well-being during the time that he resided in Virginia. The Family Court also heard testimony regarding the Child's significant health problems that required

---

[4] Although no longer relevant because the Father was not living with her, the ICPC request for the Child's placement with the paternal grandmother had been denied because the home failed to meet Virginia's provider regulations.

he attend numerous doctor appointments as well as receive weekly physical, occupational, and swallowing therapy.

(11) Following the hearing, the Family Court issued a written decision terminating the Father's parental rights in the Child. The Family Court found by clear and convincing evidence that the Father had failed to plan adequately for the Child's physical and emotional needs.[5] The Family Court also found by clear and convincing evidence that (i) the Child had entered DFS custody as an infant and had remained in DFS custody for approximately eleven months,[6] (ii) the Father was not able to assume legal and physical custody of the Child and pay for his support,[7] and (iii) failure to terminate the Father's parental rights would result in physical risk to the Child due to the Father's inability to care for the Child's medical issues, the Father's lack of appropriate housing, and the Father's untreated mental health issues.[8] The court noted that the Father's failure to address his epilepsy diagnosis and mental health issues undercut his claim that he would be able to attend to the Child's significant medical needs. The court also found that the Father's assertion that he had a support network of family members who would help him care for the Child was belied by the fact that they had not been involved in the Child's life while

---

[5] 13 *Del. C.* § 1103(a)(5).

[6] 13 *Del. C.* § 1103(a)(5)a.1.

[7] 13 *Del. C.* § 1103(a)(5)a.4.

[8] 13 *Del. C.* § 1103(a)(5)a.5.

he was in DFS custody. The Family Court next found by clear and convincing evidence that DFS had made reasonable efforts to plan with the Father and reunify the family.

(12) Finally, the Family Court considered the best-interests factors under 13 *Del. C.* § 722 and found, by clear and convincing evidence, that termination of the Father's parental rights was in the Child's best interest.[9] In doing so, the Family Court observed that the Child had never resided with the Father and that the Father's limited contact with the Child was not sufficient for the Child to develop a bond with him. In contrast, the court found that the Child was bonded to his foster parents, with whom he had lived since he was discharged from the NICU. This appeal followed.

(13) On appeal, the Father's counsel filed an opening brief and a motion to withdraw under Supreme Court Rule 26.1(c). The Father's counsel asserts that he has reviewed the record and has determined that no arguable claim for appeal exists. The Father's counsel informed the Father of the provisions of Rule 26.1(c), and

---

[9] The best interest factors include: (i) the wishes of the parents regarding the child's custody and residential arrangements; (ii) the wishes of the child regarding his custodians and residential arrangements; (iii) the interaction and interrelationship of the child with his parents, grandparents, siblings, persons cohabitating in the relationship of husband and wife with a parent of the child, and any other residents of the household or persons who may significantly affect the child's best interests; (iv) the child's adjustment to his home, school, and community; (v) the mental and physical health of all individuals involved; (vi) past and present compliance by both parents with their rights and responsibilities to the child under 13 *Del. C.* § 701; (vii) evidence of domestic violence; and (viii) the criminal history of any party or resident of the household. 13 *Del. C.* § 722(a).

8

provided him with a draft of the 26.1(c) brief and a copy of counsel's motion to withdraw. The Father has provided points for the Court's consideration, which counsel incorporated into his Rule 26.1(c) brief. The Father's points may be fairly summarized as follows: (i) he completed all of the elements of his case plan; (ii) he is willing to do whatever DFS asks him to do; (iii) he has pending job interviews; (iv) he is no longer homeless; (v) he has found a support system to help him care for the Child; and (vi) it is not in the Child's best interest to grow up in foster care. DFS and the Child Attorney have responded to the Rule 26.1(c) brief and have moved to affirm the Family Court's judgment.

(14)  On appeal, this Court is required to consider the facts and the law as well as the inferences and deductions made by the Family Court.[10] We review legal rulings *de novo*.[11] We conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly erroneous.[12] If the trial judge has correctly applied the law, then our standard of review is abuse of discretion.[13] On issues of witness credibility, we will not substitute our judgment for that of the trier of fact.[14]

---

[10] *Wilson v. Div. of Family Servs.*, 988 A.2d 435, 439-40 (Del. 2010).

[11] *Id.* at 440.

[12] *Id.*

[13] *Id.*

[14] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).

(15) The statutory framework under which the Family Court may terminate parental rights requires two separate inquiries.[15] First, the court must determine whether the evidence presented meets one of the statutory grounds for termination.[16] If the Family Court finds a statutory basis for termination of parental rights, the court must determine whether, under 13 *Del. C.* § 722, severing parental rights is in the best interests of the child.[17] Both of these requirements must be established by clear and convincing evidence.[18]

(16) After careful consideration of the parties' respective positions on appeal and a thorough review of the record, the Court has determined that this appeal should be affirmed on the basis of the Family Court's thorough and well-reasoned November 25, 2019 decision. Because an appeal is heard on the evidence submitted to the trial court, we cannot consider the Father's new claims that he has stable housing and a support system on appeal.[19] Moreover, the Family Court's findings that the Father failed to complete significant portions of his case plan and that

---

[15] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000).

[16] *Id.* at 537.

[17] *Shepherd*, 752 A.2d at 537.

[18] *Powell v. Dep't of Servs. for Children, Youth and Their Families*, 963 A.2d 724, 731-32 (Del. 2008).

[19] Del. Supr. Ct. R. 9(a); *Del. Elec. Co-op., Inc. v. Duphily*, 703 A.2d 1202, 1206 (Del. 1997) ("It is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by a trial court. Parties are not free to advance arguments for the first time on appeal.").

termination of his parental rights was in the Child's best interest are well-supported by the record. There is no error in the Family Court's application of the law to the facts. We are satisfied that the Father's counsel made a conscientious effort to examine the record and the law and properly determined that the Father could not raise a meritorious claim on appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is AFFIRMED. Counsel's motion to withdraw is moot.

BY THE COURT:

*/s/ Karen L. Valihura*_____
Justice

11